## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 17 2017, 6:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: the Matter of:
J.S.B.(1), J.S.B.(2), and J.B.
(Minor Children), Children in
Need of Services,

and

S.M. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner*

October 17, 2017

Court of Appeals Case No.
02A03-1704-JC-781

Appeal from the Allen Superior
Court

The Honorable Charles F. Pratt,
Judge

Trial Court Cause Nos.
02D08-1607-JC-305
02D08-1607-JC-306
02D08-1607-JC-307

**Baker, Judge.**

[1] S.M. (Mother) appeals the trial court's order adjudicating her three children, J.S.B.(1), J.S.B.(2), and J.B., to be Children in Need of Services (CHINS). Mother argues that there is insufficient evidence to support the CHINS adjudication. Finding the evidence sufficient, we affirm.

## Facts

[2] Mother is the single mother of three children: J.S.B.(1) and J.S.B.(2), who are twins born on December 19, 1999, and J.B., who was born on January 24, 2002.

[3] All three children have been in legal trouble at some point. In November 2015, J.S.B.(2) was on an informal adjustment probation for theft. In March 2016, she moved to formal probation following probation violations and a new charge of disorderly conduct. Her probation included case management services and individual therapy. J.S.B.(2) was also being electronically monitored; despite such monitoring, she escaped from home detention and the Youth Services Center, where she was residing after being removed from Mother's home. J.S.B.(1) and J.B. have also been under juvenile probation supervision.

[4] On July 5, 2016, Mother called Department of Child Services (DCS) because she "was overwhelmed with some of the stuff going on in my home." Factfinding Tr. p. 7. Mother asked DCS for services for her three daughters because she did not believe that there were "enough services to help out with what was going on." *Id.* DCS intake worker Haley Hunter went to Mother's home to speak with Mother. Hunter observed that the children "seemed very

desensitized to everything. Like . . . nothing extreme was going on even though there was a lot of chaos in the home." *Id.* at 88. Mother told Hunter that the children were disrespectful to her and unruly. During Hunter's visit, Mother and the children got into an argument because Mother thought one of the children had stolen her cigarettes. Mother told Hunter that, regarding physical fights, if one of her children "were to touch her that she would touch the other one back." *Id.* at 83. Mother also stated that "she would lock herself in her room just to get away from them." *Id.*

[5] While Hunter was at Mother's home, J.S.B.(1) told Hunter that she was not getting along with Mother; she also stated that she had an infection or may have been pregnant, and although she asked Mother about seeing a doctor, Mother refused to take her. Mother confirmed that she would not be willing to take J.S.B.(1) to the doctor. J.B. told Hunter that "she wasn't afraid of her mom because . . . stuff like this happened on a regular basis." *Id.* at 81. Both J.S.B.(1) and J.B. stated that Mother smokes Spice, a synthetic cannabinoid. Hunter also learned that Mother would lock the bathroom doors and allow the children to shower only at certain times.

[6] Following her visit, Hunter put Stop Child Abuse and Neglect (SCAN) services[1] in place. Before SCAN arrived, Mother called the police to report that one of

---

[1] The SCAN worker who visited Mother's home was a Family Preservation Coach with SCAN's Intensive Intervention Team. That SCAN team visits homes with the goal of keeping children in the home. It works to ensure that a family has the resources that it needs, focusing both on skills such as parenting, budgeting, and cleaning skills, and on material resources such as furniture and clothes. Factfinding Tr. p. 96.

her children had run away. That night, when SCAN went to Mother's house for an intake with Mother and the children, SCAN observed that J.B. was abusive toward Mother, calling her names and telling her that she was crazy for calling the police. Mother told SCAN that she had dreamed about the children hurting her while she was asleep. At some point that same night, Hunter received a text message from SCAN stating that the home environment was chaotic.

The next day, July 6, 2016, Fort Wayne Police Officer Fritz Rommel was called to Mother's house for a domestic dispute; Mother had stated that she wanted the children to leave the home. Mother also stated that her daughters "were out of control, disrespectful, cussing at her . . . . [S]he said she was fed up and tired and didn't want them in the home anymore." *Id.* at 54-55. Officer Rommel called Hunter, who returned to Mother's home. Mother told Hunter that she wanted the children out of the house. The children were removed from the home and taken to Youth Services Center. Following the removal, Hunter interviewed J.S.B.(2), who had not been present during Hunter's visit to Mother's home the day before. J.S.B.(2) stated that she was not getting along with Mother and that Mother smokes Spice.

On July 27, 2016, DCS filed an amended petition alleging the children to be CHINS. A factfinding hearing took place on October 24, 2016,[2] and the trial court adjudicated all three children to be CHINS. At some point following this adjudication, the children returned to Mother's home. On February 1, 2017, a dispositional hearing took place.[3] That same day, the trial court issued a dispositional order that ordered Mother and the children to participate in reunification services. Mother now appeals.

# Discussion and Decision

# I. Standard of Review

Mother argues that there was insufficient evidence to support the trial court's determination that J.S.B.(1), J.S.B.(2), and J.B. are CHINS. Our Supreme Court has explained the nature of a CHINS proceeding and appellate review of a CHINS finding as follows:

> A CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.R.*, 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of*

---

[2] Indiana Code section 31-34-11-1 requires a factfinding hearing to take place not more than sixty days after the filing of a petition alleging a child to be a CHINS unless all parties consent to an extension of an additional sixty days. Here, the parties consented to additional time.

[3] Indiana Code section 31-34-19-1 requires a dispositional hearing to take place not more than thirty days after a trial court adjudicates a child to be a CHINS. In this case, the dispositional hearing took place more than *ninety* days after the CHINS adjudication. Although Mother did not raise the issue, we take this opportunity to remind the trial court to follow the timeline for CHINS adjudications set forth by our General Assembly.

*Pub. Welfare*, 592N.E.2d 1232, 1235 (Ind. 1992).  We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom.  *Id.*  We reverse only upon a showing that the decision of the trial court was clearly erroneous.  *Id.*

*In re K.D.*, 962 N.E.2d 1249, 1253-54 (Ind. 2012) (footnote omitted).

[10] Here, DCS alleged that the children are CHINS pursuant to Indiana Code section 31–34–1–1, which provides as follows:

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

[11] Our Supreme Court has interpreted this provision to require "three basic elements:  that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those

needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014).

# II. Sufficiency

[12] Mother argues that the evidence was insufficient to show neglect on her part or that she needed the trial court's coercive intervention to resolve the family's problems.

[13] While the dysfunction that Mother and the children face is not the worst of the worst, Mother has admitted that she cannot control her children. J.S.B.(1), J.S.B.(2), and J.B. have all faced legal trouble at some point in their young lives. Even electronic monitoring did not foster in J.S.B.(2) respect for authority, and she escaped from both home detention and the Youth Services Center while on it. Mother admitted to being overwhelmed by the children's behavior and told Officer Rommel that she did not want them in her home. Mother also admitted that she would lock herself in her room in order to get away from the children and that she was concerned about them stealing from her. J.S.B.(1) stated that Mother refused to take her to a doctor for medical care. The children were desensitized to the level of chaos that permeated their home. J.S.B.(1) and J.S.B.(2) both reported that they were not getting along with Mother. J.B. stated that she was not afraid of Mother, and SCAN observed J.B. yelling at Mother and calling her names. In short, the children's needs for adequate supervision and care are unmet in Mother's home.

[14] Moreover, the children's unmet needs are unlikely to be provided for without the coercive intervention of the court. While we recognize that Mother contacted DCS specifically to get help for the problems in her family, we note that, in order to try to get the help that she needs, she had to turn to a state agency. In other words, she was not able to obtain sufficient help on her own without the State's aid. This family needs support and services to become functional. Court intervention, therefore, is necessary to prevent the family's situation from getting completely out of hand; without it, needed services likely would not be available for Mother and the children. Accordingly, we find no error with the trial court's conclusion that the children need care that they are not receiving and are unlikely to receive without the coercive intervention of the court.

[15] Lastly, we note that the trial court did not address in its order whether the children's physical or mental conditions are "seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child[ren]'s parent . . . to supply the child[ren] with necessary food, clothing, shelter, medical care, education, or supervision[.]" I.C. § 31–34–1–1(1). While we find no statutory requirement that the trial court explicitly address this prong of the CHINS statute, our appellate review would benefit from the trial court's doing so.

[16] In this case, however, despite the trial court's lack of findings specifically addressing the children's physical or mental conditions, the totality of the record shows that a finding could have been made. Mother's inability to

provide necessary supervision to her children seriously endangers them. Indeed, during Mother's attempt to secure help, she called the police to report that one of her children had run away; another time, J.S.B.(2) escaped from the Youth Services Center while being electronically monitored. In addition, Mother refused to take J.S.B.(1) to the doctor. Mother also reported that she would lock herself in her room to get away from the children—meaning that there were times when she made herself unavailable for her children solely for the purpose of being unavailable, and there is no evidence in the record that shows that Mother made an effort to provide appropriate supervision for her children during those times.

[17] This family needs help managing the children's behavior, and the CHINS adjudication and services that go along with it will provide them with the assistance that they need.

[18] The judgment of the trial court is affirmed.

Bailey, J., and Altice, J., concur.